# United States Court of Appeals
## For the First Circuit

No. 00-1857

AMILCAR GUILLOTY PEREZ,

Plaintiff, Appellant,

v.

PEDRO PIERLUISI; LYDIA MORALES;
DOMINGO ALVAREZ AND ARMANDO SANCHEZ,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, Chief U.S. District Judge]

Before

Torruella, Selya and Lipez, Circuit Judges.

Irma R. Valldejuli for appellant.
Roberto Márquez-Sanchez, with whom Law Offices of Benjamin
Acosta, Jr., was on brief, for appellees Pierluisi and Morales.
Leticia Casulduc Rabell, Assistant Solicitor General, with
whom Roberto J. Sanchez Ramos, Solicitor General, and Vanessa Lugo
Flores, Deputy Solicitor General, were on brief, for appellees
Alvarez and Sanchez.

August 7, 2003

**LIPEZ, Circuit Judge.**  Amilcar Guilloty Perez ("Guilloty"), an agent in the Special Investigation Bureau of the Puerto Rico Department of Justice, brought suit against four higher-ranking officials in the Department of Justice alleging that they retaliated against him for exercising his First Amendment rights.  After an eight-day jury trial the district court granted the defendants' motions for judgment as a matter of law under Fed. R. Civ. P. 50.  Guilloty now appeals, arguing that he presented sufficient evidence for the case to go to the jury.  We agree with the district court that no reasonable jury could have rejected the defense of the government officials that they would have given Guilloty negative evaluations and extended his probationary period even in the absence of his protected conduct.

## I.

Guilloty brought suit under 42 U.S.C. § 1983 (2002), arguing that certain Department of Justice officials retaliated against him after he reported instances of alleged corruption and improper handling of investigations within the Special Investigation Bureau ("SIB").  Before we reach the question of whether Guilloty adduced sufficient evidence of protected activity and subsequent retaliation, we will summarize the relevant evidence produced during the eight-day trial.

## A. The Parties

Guilloty has been an agent with the Department of Justice since February 1994. After completing his training in May 1994, Guilloty was assigned to the Organized Crime Investigation Division of the Special Investigation Bureau, working out of the Department's Ponce district office. Defendant-appellee Armando Sanchez was Guilloty's immediate supervisor in the Ponce office from May 1994 until Guilloty was transferred to a different office in October 1996. Defendant-appellee Domingo Alvarez was the director of the Organized Crime Investigation Division from July 1994 until December 1996, and was Sanchez's supervisor during that time. Defendant-appellee Lydia Morales was the Director of the Special Investigation Bureau from July 1994 through December 1996, and served as Alvarez's supervisor. Pedro Pierluisi was the Secretary of Justice during the relevant time period until December 1995. Among his numerous other duties, he served as Morales's supervisor.[1]

## B. Guilloty's Charges

Guilloty complained about three incidents involving the conduct of his supervisor Sanchez and other agents in the Ponce district office. The first incident and complaint related to a

---

[1] Guilloty also brought suit against José Fuentes Agostini, Pierluisi's successor as the Secretary of Justice of Puerto Rico. The district court granted Fuentes Agostini's motion for summary judgment before the trial began. Guilloty does not appeal this ruling.

botched drug importation investigation. In May 1995, Guilloty went to see Director Alvarez to report that he had received information from an informant in August 1994 that a corrupt police officer (not one of the defendants) was providing protection for drug shipments.[2] Guilloty told Alvarez that he had passed this information on to his supervisor Sanchez, and had also told Sanchez that United States Customs agents were investigating the same importation and cover-up and were interested in collaborating with the Puerto Rican agents on this investigation. Guilloty told Alvarez that while he made a number of reports between August 1994 and May 1995 and repeatedly asked Sanchez if he could share his information with the federal agents working on the case, Sanchez refused to act on the reports or make a final decision regarding agency cooperation. Eventually, Guilloty passed on the results of his investigation to the federal officers, and they arrested the corrupt police officer and seized a shipment of drugs in May 1995. Guilloty went to Alvarez in May 1995 to complain about Sanchez's failure to fully authorize investigation of this drug shipment and cover-up after Guilloty read in the newspaper about the arrests by the federal officers.

In August 1995, a few months after his meeting with Alvarez and after seeing no signs of an investigation, Guilloty met

---

[2] We have provided an appendix setting forth a chronology of the important dates and events in this case.

-4-

with SIB Director Morales and made the same charges against his supervisor, Sanchez. Morales told him she would order an internal investigation of the incident, but Guilloty was never interviewed as part of such an investigation, and Morales was never asked at trial whether any such investigation occurred.

At this August 1995 meeting with SIB director Morales, Guilloty informed her of his suspicions that Ponce district office agents (including Sanchez) were receiving illegal gifts from the owner of a local stable that Guilloty also suspected of being involved in illegal drug importation. Guilloty had accompanied two agents to the stable where they received what he believed to be gifts of hay. During this visit, his fellow agents told him that he could obtain a horse from the owner of the stable, and that there was a horse waiting there for Sanchez as well. Director Morales did not act on his information. Morales testified at trial that Guilloty never told her about his suspicions regarding bribes.

Finally, Guilloty blew the whistle on a fellow agent who allegedly made a false statement in an affidavit to support the seizure of an automobile. In January 1995, a small group of Ponce district agents, including Guilloty, executed an arrest warrant for a suspect. One of the other agents involved in the arrest, Maximino Rivera Laporte, filed a sworn statement to support the seizure of the suspect's car. In that statement, he swore that the suspect was observed smoking marijuana in his car before his

arrest. Four months later, Guilloty became aware of the contents of this sworn statement, and informed the agent in charge of the case, Una Sepulveda, that the contents of the sworn statement were false -- the suspect was not smoking marijuana in his car before his arrest. At this same time, Sepulveda and Guilloty also informed Sanchez of the false statements. Sanchez tried to convince Guilloty to keep this incident quiet, offering him a transfer he had asked for previously and other benefits. Instead, Guilloty reported the incident to Director Alvarez when he met with him in May 1995. Guilloty then reported the situation to Director Morales at the August 1995 meeting.

These incidents of alleged corruption and questionable police conduct -- the botched drug investigation, the gifts from the stable, and the false statement and the bribe to keep it quiet -- occurred over an eleven-month period between June 1994 and April 1995, but Guilloty first went to Director Alvarez in May 1995, and then to Director Morales in August 1995 to report his suspicions. Guilloty never met personally with Secretary Pierluisi. In November 1996, the local newspaper El Vocero published a series of articles discussing alleged corruption within the SIB, citing an inside source. The parties do not dispute that Guilloty was the inside source for these articles.

## C. Guilloty's Evaluations

At trial, the defendants and their witnesses testified that Guilloty was underperforming as an agent with the SIB. In September 1994, only three months after Guilloty began working with the SIB, Sanchez, the supervisor of the SIB in the Ponce district office, sent a memorandum to Director Alvarez detailing a number of complaints raised by Guilloty's fellow agents. These agents described Guilloty's inappropriate questioning of confidential informants and otherwise questionable conduct while in the community. Sanchez stated that he believed Guilloty could be endangering his fellow agents by his conduct. Director Alvarez forwarded this memo to Director Morales, who instructed Alvarez to acquire "data" on Guilloty, including information on his history of conduct with the SIB. Alvarez and Morales met to discuss the problems with Guilloty.

In March 1995, Sanchez sent another memorandum to Director Alvarez describing more recent problems Guilloty was experiencing on the job. Specifically, Sanchez explained that Guilloty had recently disrupted a nighttime surveillance of suspected criminal behavior when he brought, and used, a flash camera to photograph the individuals under surveillance. According to Sanchez's memo, the subjects of the surveillance quickly dispersed after seeing the flash, and the investigation was scrapped. By the end of May, Sanchez had sent Alvarez three

additional memos outlining problems he was having with Guilloty. Sometime before May 1995, Sanchez's memos were given to Juan Reyes, an SIB agent from a different district office, so that he could conduct an independent investigation of the charges listed therein. In August 1995, Reyes reported that the incidents described in the memos could be substantiated, and he recommended that the charges against Guilloty be referred to the Justice Department's Inspector General.

During this time, Guilloty was still in his probationary period as an agent and subject to regular evaluations.[3] His first evaluation, covering April 1994 to June 1994, was generally negative, but his next three evaluations, covering three quarters from July 1994 to March 1995, were generally positive. Guilloty's final two evaluations, delivered to him in November 1995 and January 1996, were highly critical, revealing negative conclusions in nearly all categories listed.[4]

---

[3] Justice Department agents are in probationary status for their first two years in the Department. After the two years are concluded, the Department is supposed to either offer the agent a permanent position or discharge the agent. Hired in February 1994, Guilloty should have been in probationary status only until February 1996. In actuality, the Department did not make a final decision regarding Guilloty's permanent status until three years later. Although Guilloty eventually obtained permanent status, he claims that this three-year period of uncertainty was a form of retaliation for exercising his First Amendment rights.

[4] Additionally, in January 1996, Sanchez submitted a memo to Director Morales (through Director Alvarez) stating that Guilloty had not completed the probationary period satisfactorily, and recommending his dismissal. Guilloty was unaware of Sanchez's

Guilloty lodged a formal complaint about these negative evaluations by writing a letter to Alvarez, Morales, and Secretary Pierluisi.[5]  In this letter, along with challenging the evaluations directly, Guilloty claimed that the negative evaluations were an attempt by Sanchez to retaliate against him for speaking out about irregularities in the Ponce district office.  After some discussion between Morales and Secretary Pierluisi's office, Morales held a meeting attended by Guilloty, Sanchez, Alvarez, and a Department attorney in September 1996.  Guilloty was presented with the memos Sanchez had written between September 1994 and May 1995 detailing Guilloty's errors on the job.  Guilloty insisted that his conduct was appropriate at all times, and Sanchez and Alvarez insisted that the negative evaluations and memoranda correctly described Guilloty's inappropriate conduct.  Guilloty mentioned again to Morales the questionable activities in the Ponce office, and he told Morales that the negative evaluations Sanchez gave him were in retaliation for his speaking to Alvarez and Morales about the irregularities in the Ponce office.  After the parties failed to arrive at a compromise solution, Guilloty agreed to accept a

recommendation of dismissal at the time the memo was sent.

[5] Guilloty also reported his disagreement with these negative evaluations to Martha Marrero, a union representative at the Department of Justice.  Marrero eventually met with Secretary Pierluisi to discuss Guilloty's situation, but Pierluisi did not intervene in ongoing discussions among Guilloty, Sanchez, Alvarez and Morales.

transfer he had previously requested to a district office closer to his home.  He was transferred the next month.

**D. The District Court's Decision**

At the close of the plaintiff's case in chief, all four defendants moved for judgment as a matter of law pursuant to Rule 50.  The court granted the motion of defendant Secretary Pierluisi, concluding that the evidence adduced by the plaintiff "fail[ed] to show reckless disregard, callous disregard," for Guilloty's First Amendment rights.  The court denied the motion as to Morales, Alvarez and Sanchez.  After the close of the defendants' cases, the three remaining defendants renewed their Rule 50 motions and also argued for qualified immunity.

The court granted judgment for all three defendants and subsequently filed an order explaining its decision.  Finding that Guilloty's complaints of corruption and questionable police tactics were generally unsupported and overly disruptive to the operation of the SIB, the court concluded that his First Amendment rights did not outweigh the rights of the Department in efficient agency performance.  See Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).  The court also found that Guilloty could not show that his speaking out was a substantial factor motivating the negative evaluations he received, given that most of them were written before he began to complain about the Department.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

-10-

Even if Guilloty had shown the requisite connection between the evaluations and his speaking out, the court concluded that the defendants "met the burden of showing that they would have taken the same adverse actions against Guilloty even if he had never spoken out on the alleged improprieties within the SIB." Guilloty-Perez v. Sanchez, No. 97-1264 (HL), slip op. at 7 (D.P.R. May 12, 2000). On the question of qualified immunity, the court concluded that the defendants were immune from suit because there was no clearly established law indicating that the Department's treatment of Guilloty's complaints was unconstitutional.

## **II.**

We review the district court's grant of judgment as a matter of law de novo. Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002). Judgment as a matter of law under Rule 50(a) is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the [non-moving] party." Fed. R. Civ. P. 50(a)(1). In reviewing the district court's ruling, we apply "the same standards as the district court," Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir. 1996) (quoting Andrade v. Jamestown Housing Auth., 82 F.3d 1179, 1186 (1st Cir. 1996)), meaning that we "examine the evidence and all fair inferences in the light most favorable to the plaintiff and may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Id. (quoting Richmond Steel, Inc. v. Puerto

Rican Am. Ins. Co., 954 F.2d 19, 22 (1st Cir. 1992)).  If we conclude that "fair-minded persons could draw different inferences from the evidence presented at trial, the matter is for the jury," and judgment as a matter of law was improperly granted.  Espada, 312 F.3d at 2.  Nevertheless, if the non-moving party has the burden of proof in the underlying case, that party must have presented "more than a mere scintilla of evidence in its favor" to withstand judgment as a matter of law.  Invest Almaz v. Temple-Inland Forest Prods. Corp., 243 F.3d 57, 76 (1st Cir. 2001) (quoting Katz, 87 F.3d at 28) (internal quotation marks omitted).

## A. First Amendment Rights of Government Employees

A government employee does not lose his First Amendment right to comment on matters of public concern by virtue of his employment with the government.  Connick v. Myers, 461 U.S. 138, 147 (1983).  When analyzing an employee's claim that his governmental employer retaliated against him for speaking out, the court's task is to seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Pickering, 391 U.S. at 568.  Like the district court, we consider this complicated relationship between free speech and public employment through the prism of a three-part test extracted from the Supreme Court's decisions in Connick, 461 U.S. at 147,

-12-

Pickering, 391 U.S. at 563, and Mt. Healthy, 429 U.S. at 274. See Mullin v. Town of Fairhaven, 284 F.3d 31, 37-38 (1st Cir. 2002) (setting forth three-part test).

Our first task, laid out by the Supreme Court in its opinion in Connick, is to determine "whether the speech at issue involves 'matters of public concern.'" Id. at 37 (quoting Connick, 461 U.S. at 147). If an employee speaks out only on a matter of personal interest, the First Amendment value of his words is low, and "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick, 461 U.S. at 147. If the court concludes that the employee did speak out on a matter of public concern, the second step requires the court to "balance the strength of plaintiffs' and the public's First Amendment interests against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency or entity must provide through" its employees. Mullin, 284 F.3d at 37 (internal quotation marks omitted). This evaluation of the employee's rights and the employer's interests is referred to as the "Pickering balancing" test. See id., (citing Pickering, 391 U.S. at 568). These first two parts of the analysis -- the Connick matters of public concern and Pickering balancing determinations -- "depend on whether the employee statements 'are

-13-

of a character which the principles of the First Amendment . . . protect,'" and, therefore, are questions of law subject to de novo review. O'Connor v. Steeves, 994 F.2d 905, 912 (1st Cir. 1993) (quoting Connick, 461 U.S. at 150 n.10).

If the court determines that the Pickering balance favors the employee's First Amendment rights over the efficiency interests of the government agency, the employee must next show that the "protected expression was a substantial or motivating factor" in the adverse employment decision. Mullin, 284 F.3d at 38 (citing Mt. Healthy, 429 U.S. at 287). If the employee makes an adequate showing on this point, the defendants must counter by proving by a preponderance of the evidence that the governmental agency would have taken the same action against the employee "even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287. If the employer cannot adduce evidence of an alternative justification for the employment action, or if that evidence, once adduced, does not suffice to prove the point, the employee has established a constitutional violation.

## B. Application to Guilloty's Case

Guilloty's constitutional claim is based on the statements he made to Sanchez, Alvarez, and Morales regarding three incidents at the Ponce district office: (1) the allegedly mishandled drug investigation; (2) the improper gifts allegedly received by Ponce district agents from a stable owner; and (3) a

-14-

fellow agent's false claims in a sworn statement.  Guilloty argues that his complaints to officials within his chain of command constituted activity protected under the First Amendment, and that the named defendants violated his constitutional rights by giving him poor marks on his evaluations and withholding a determination on his status as a permanent agent for three years.[6]

        1. The Connick "Public Concern" Test

Turning to the Connick inquiry, we conclude that the subjects of Guilloty's statements to his superior officers involved matters of public concern.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48.  Guilloty's statements described his suspicion that the SIB was mishandling a potentially important investigation and the possibilities of police corruption and perjury.  The diligence and lawfulness of a police department's activities are matters of great interest to the public.  See Branton v. City of Dallas, 272 F.3d 730, 740 (5th Cir. 2001) ("Exposure of official misconduct, especially within the police

---

[6] Although Secretary Pierluisi was involved neither in Guilloty's evaluations nor in his appeals, Guilloty argues that the Secretary is also liable under section 1983 because Guilloty reported to him (in his letter objecting to the January 1996 evaluations and through his union representative Marrero) that he was being retaliated against for speaking out about irregularities in the Ponce district office but Pierluisi failed to take action.

department, is generally of great consequence to the public."). Guilloty's frustrations with the conduct of his fellow agents and his supervisor Sanchez went beyond mere concerns over the internal working conditions of the department. See Connick, 461 U.S. 148 (concluding that plaintiff's questionnaire regarding office transfer policy, morale and confidence in supervisors did not implicate matters of public concern); Tang v. Rhode Island, 163 F.3d 7, 12 (1st Cir. 1998) ("None of these matters constitutes an issue of public concern; they are all individual personal complaints about working conditions."). Nor is there any indication that Guilloty revealed his suspicions to Alvarez and Morales to benefit himself personally or professionally. See Mullin, 284 F.3d at 39 (recognizing that motive is relevant to the analysis of whether an issue raised by a government employee is of public concern). Finding that Guilloty's statements addressed issues of public concern, we must move on to balance Guilloty's interest in making those statements against the Department's interests.

2. The Pickering Balancing Test

Under Pickering, we are required to balance the value of an employee's speech -- both the employee's own interests and the public's interest in the information the employee seeks to impart -- against the employer's legitimate government interest in "preventing unnecessary disruptions and inefficiencies in carrying

out its public service mission." O'Connor, 994 F.2d at 915 (citing Pickering, 391 U.S. at 568-75). As the Supreme Court explained in Rankin v. McPherson:

> This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment. On the one hand, public employers are employers, concerned with the efficient function of their operations. . . . On the other hand, "the threat of dismissal from public employment is . . . a potent means of inhibiting speech." Pickering, 391 U.S. at 574. Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.

483 U.S. 378, 384 (1987).

In evaluating this balance, the content of the employee's speech is once again relevant. The Connick inquiry -- whether the subject of the employee's speech was of public concern -- serves a gatekeeping function in these cases by permitting a court to award judgment to the defendant once it determines that the speech was not of public concern. But the principles of Connick are also relevant to the Pickering inquiry: the greater the value of the subject of the speech to the public, the more the balance tilts towards permitting the employee to express himself. As we found in the previous section, Guilloty's reports to Sanchez, Alvarez and Morales regarding misconduct and possible corruption within the SIB

-17-

contained information of great interest to the public. "When balancing the rights of the employee against those of the employer, an employee's First Amendment interest is entitled to greater weight where he is acting as a whistleblower in exposing government corruption." Conaway v. Smith, 853 F.2d 789, 797 (10th Cir. 1988); see O'Connor, 994 F.2d at 915 ("O'Connor's disclosures concerned alleged abuse of public office on the part of an elected official, a matter traditionally occupying the highest rung of the hierarchy of first Amendment values."); see also Moore v. City of Wynnewood, 57 F.3d 924, 933 (10th Cir. 1995) ("For example, Moore did not disclose any 'wrongdoing or inefficiency or other malfeasance on the part of the government[],' which we have previously recognized as particularly important matters of public concern.") (quoting Koch v. City of Hutchinson, 847 F.2d 1436, 1445-47 (10th Cir. 1988) (en banc) (alteration in original)). The substantial public interest in Guilloty's observations as an agent with the SIB "heavily weight[s] the Pickering scale in favor of First Amendment protection against retaliation" for Guilloty's speech. O'Connor, 994 F.2d at 916.

On the other side of the balance is the Department of Justice's legitimate interest in maintaining the effective functioning of the SIB. The Supreme Court recognized in Rankin a number of considerations pertinent to this analysis:

> [W]hether the statement impairs discipline by
> superiors or harmony among co-workers, has a

-18-

> detrimental impact on close working
> relationships for which personal loyalty and
> confidence are necessary, or impedes the
> performance of the speaker's duties or
> interferes with the regular operation of the
> enterprise.

483 U.S. at 388; see also McDonough v. Trs. of the Univ. of N.H., 704 F.2d 780, 784 (1st Cir. 1983) (outlining similar factors). The importance of discipline, maintenance of harmony among co-workers, and close working relationships requiring personal loyalty and confidence is greater in the context of a law enforcement agency like the SIB than it might be in another type of government agency. See Conaway, 853 F.2d 798 (comparing a police department to a building inspection agency); see also Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000) (recognizing the "heightened need for order, loyalty, morale and harmony" in a police department); Moore, 57 F.3d at 934 (same). Therefore, courts must be sensitive to the needs of law enforcement agencies in disciplining an employee whose expressive conduct interferes with these interests.

Certainly, in theory, Guilloty's charges that his fellow agents were accepting inappropriate gifts could have caused conflict within the SIB. There was also the potential for conflict in his complaints that his supervisor, Sanchez, mishandled an investigation, and that a fellow agent submitted a false sworn statement to support the seizure of a car. Nevertheless, the defendants failed to show that there were any such disruptions.

Guilloty did not go public with his complaints about the Ponce district office until November 1996, at least one month after he had been transferred out of the office. Until that time, Guilloty primarily aired his concerns only to his superior officers -- Sanchez, Alvarez, and Morales.[7] There is no evidence that any internal investigations of his allegations occurred until after they were published in the newspaper. Therefore, the possibility of internal conflict among agents who knew they were under investigation and still had to work alongside Guilloty, the whistleblower, never materialized.

The district court stated in its written decision that "the balancing at the second prong of the Pickering test supported a finding that Guilloty's conduct had a detrimental impact on the

---

[7] In one circumstance -- regarding the false sworn statement -- Guilloty also made a fellow agent, Una Sepulveda, aware of the improper conduct. Guilloty only became aware of the false contents of this sworn statement when Agent Sepulveda was assigned to organize the paperwork to support the arrest and the seizure of the suspect's car. As Agent Sepulveda testified at trial: "I found the sworn statement and I started reading it out loud, and it just so happened that Guilloty was standing right next to me." Guilloty remarked to Agent Sepulveda at that time that he did not believe the facts of the sworn statement were true. Agent Sepulveda then showed the statement to another agent and asked him whether the facts in it were true. This agent agreed with Guilloty that the affidavit contained false statements. Agent Sepulveda then took this agent and Guilloty into Sanchez's office where Sepulveda reported her suspicions. As Sanchez did not follow up on these allegations, there is no evidence that any other agents (outside those who met with Sanchez) ever found out about the allegations, or that the agent who made the alleged false statement was investigated, before Guilloty took his allegations to the newspaper.

working relationships of the Ponce SIB office. The evidence shows that a number of [Guilloty's] fellow agents did not have faith in him." Guilloty-Perez, slip op. at 4-5. After a thorough review of the record, we disagree with the district court's finding of a link between any lack of faith in Guilloty among his co-workers and Guilloty's complaints. The documentary evidence and testimony indicated that Ponce district office agents were hesitant to work with Guilloty because he made inappropriate comments to confidential informants and, in one instance, may have ruined an investigation because he used the wrong type of surveillance equipment. Sanchez summarized these complaints -- the reasons that Ponce district agents were unwilling to work with Guilloty -- in his September 1994 and March 1995 memos to Alvarez. There is no evidence in the record that fellow agents had lost faith in Guilloty or were unwilling to work with him because he had lodged complaints with Sanchez, Alvarez or Morales.[8]

In this manner, this case is similar to the situation presented in O'Connor v. Steeves, 994 F.2d at 916. There, we

---

[8] At the time Sanchez was receiving complaints from Ponce district office agents regarding Guilloty's tactics, Guilloty had not yet taken his complaints beyond Sanchez's office. All parties agree that Guilloty did not meet with Alvarez until May 1995 (and Morales in August 1995), at least two months after Sanchez's memo to Alvarez regarding the flash photography incident at the drug surveillance. Therefore, it is debatable whether Guilloty even engaged in any protected activity before May 1995, thus undermining the defendants' claims of a link between such activity and co-worker complaints recorded in September 1994 and March 1995.

-21-

concluded that the Pickering balance weighed in favor of the employee O'Connor because the defendant town had failed to demonstrate a legitimate interest in curtailing O'Connor's disclosures. "Although the Town has shown considerable disruption in the Department operations, and serious deterioration in the working relations between O'Connor and Steeves, . . . it has not yet met its burden of showing that the disruption was attributable to the exercise of O'Connor's First Amendment right to speak out on this subject." Id. at 916 (emphasis added). O'Connor and Steeves had a long-standing dispute regarding authority over a town department that preceded O'Connor's public reporting of Steeves' questionable activities. Id. at 908. Similarly, in Guilloty's case, his fellow agents' complaints about him preceded his engaging in protected activity. Complaints concerning Guilloty's conduct as an agent are certainly relevant to this case because they provide an alternative non-discriminatory reason justifying his negative evaluations.[9] Nevertheless, complaints about his conduct that are not attributable to his protected activity have little relevance to the Pickering balance.

In concluding that the Pickering balance weighed in favor of the defendants, the district court also decided that two of the three incidents Guilloty complained about -- the botched drug investigation and the gifts from the stable owner -- were "lacking

---

[9] See discussion infra Part II.B.3.

-22-

in substance." <u>Guilloty Perez</u>, slip op. at 4. But as we have previously held, "the mere fact that the statements [made by the plaintiff] were erroneous does not remove them from the Constitution's protection; erroneous remarks are an inevitable by-product of unrestrained public debate." <u>Brasslett</u> v. <u>Cota</u>, 761 F.2d 827, 844 (1st Cir. 1985). Unless Guilloty "knowingly or recklessly made false statements," the subsequent determination that his allegations were untrue will not deprive them of their constitutional protection. <u>Id.</u> There is no such evidence in this case.

Consequently, because the defendants have not shown that complaints about Guilloty's conduct as an agent are attributable to his protected activity, they have failed to show a countervailing governmental interest in quelling Guilloty's speech sufficient to overcome the strong First Amendment interest in his whistleblowing speech.[10] Thus, the <u>Pickering</u> balance weighs in favor of Guilloty.

### 3. The <u>Mt. Healthy</u> "Substantial or Motivating Factor" Test

Even if the government employee adduces sufficient evidence to convince a court that his speech merits First Amendment

---

[10] We are not suggesting that establishing a causal relationship between Guilloty's protected conduct and complaints about him from fellow officers would necessarily tilt the <u>Pickering</u> balancing analysis in favor of the defendants. We are simply saying that the failure to establish such a relationship precludes a favorable finding for the defendants on the balancing analysis in this case.

protection, he still must introduce sufficient evidence to permit a finding that his participation in this protected activity was a substantial or motivating factor behind the adverse employment action. Mt. Healthy, 429 U.S. at 287. In order to satisfy his burden of proof, the employee need not produce direct evidence of his employer's motivation. See, e.g., Brasslett, 761 F.2d at 846 ("[T]he letter of dismissal written by [the defendant] . . . states unequivocally that Brasslett's comments to the press were the primary reason for his discharge."). "[A]s in other contexts where motivation is an issue, he can rely upon circumstantial evidence." Lewis v. City of Boston, 321 F.3d 207, 219 (1st Cir. 2003). The Mt. Healthy causation test is a burden-shifting test. If the plaintiff succeeds in establishing this causal relationship,[11] the

_____

[11] In our recent decision in Lewis, we stated that "if [the plaintiff] succeeds in establishing a prima facie case, the burden of persuasion shifts to the [employer]. . . ." 321 F.3d at 219 (emphasis added). Taken in a vacuum, that statement understates the plaintiff's Mt. Healthy burden. The plaintiff's burden of proving motivation under the first stage of the Mt. Healthy test is more substantial than the burden of producing prima facie evidence in, for example, the first stage of a Title VII discrimination case. A plaintiff in a Title VII case retains the ultimate burden of persuasion, and therefore, need only make a modest initial showing of discrimination before the defendant is required to offer a non-discriminatory explanation. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). In contrast, a plaintiff in a First Amendment discrimination case must produce sufficient evidence of motivation at the initial stage such that "the burden of persuasion itself passes to the defendant-employer." Acevedo-Diaz v. Aponte, 1 F.3d 62, 67 (1st Cir. 1993) (comparing Title VII and First Amendment discrimination cases) (emphasis in original). Therefore (even though discrimination must in both instances be proved by a preponderance of the evidence), the initial burden on the plaintiff under Mt. Healthy is more substantial than the "prima

-24-

burden of persuasion shifts to the defendants to prove "by a preponderance of the evidence," id., that the adverse employment action would have been taken "even in the absence of the protected conduct," Mt. Healthy, 429 U.S. at 287.

This question of motivation, though usually one for the factfinder, can be resolved by the court on a summary judgment or Rule 50 motion if the plaintiff's evidentiary showing is insufficient. See, e.g., Torres-Rosado v. Rotger-Sabat, No. 02-2103, 2003 WL 21508360, at *9 (1st Cir. July 2, 2003) (resolving the Mt. Healthy question at the summary judgment stage); Lewis, 321 F.3d at 220 (same). This determination is fact-bound. Wytrwal v. Saco Sch. Bd., 70 F.3d 165, 170 (1st Cir. 1995). Although we are to "examine the evidence and all fair inferences in the light most favorable to the plaintiff," Katz, 87 F.3d at 28, the plaintiff who must prove that the protected conduct was a motivating factor in the adverse employment action must produce some facts linking that action to his conduct. See Rakovich v. Wade, 850 F.2d 1180, 1191 (7th Cir. 1988) ("[I]n the directed verdict and judgment notwithstanding the verdict contexts, evidence of some disagreement or dislike must be accompanied by evidence linking it to the injury. More than mere speculation must serve as the basis for finding that such disagreement is the 'motivating cause.'").

---

facie case" burden on Title VII plaintiffs. Logically, then, our prior statement in Lewis cannot be read to imply a lighter burden.

-25-

Therefore, we will uphold a grant of judgment as a matter of law to a defendant "only if: (1) the record evidence compelled the conclusion that the plaintiff would have [suffered the adverse employment action] in any event for nondiscriminatory reasons, or (2) the plaintiff did not introduce sufficient evidence in the first instance to shift the burden of persuasion to the defendants." Acevedo-Diaz, 1 F.3d at 67 (emphasis added).

Guilloty argues that Sanchez, Alvarez, Morales, and Pierluisi retaliated against him by returning negative evaluations and keeping him on probationary status three years longer than he should have been.[12] The district court held that Guilloty's protected activities could not have motivated the negative evaluations because "the evidence showed that he began to receive these negative evaluations before he spoke out." Guilloty Perez, slip op. at 5. Our review of the record indicates that this is not the case. Guilloty received five evaluations while assigned to the Ponce district office. His first evaluation, given to him in October 1994 and covering the period from April to June 1994, is somewhat negative. It reports that Guilloty did not meet expectations in two categories and excelled only in one category

---

[12] As Guilloty's direct superior, Sanchez completed Guilloty's evaluations. Evidence adduced at trial indicated that Alvarez and Morales initialed evaluation forms to confirm that they had been completed but did not routinely review the content of the evaluations.

-26-

(he "met" expectations in the other seven categories).[13]  But his next evaluation is substantially better.  Given to Guilloty in December 1994 and covering the period from July to October 1994, this evaluation reports that Guilloty  excelled in eight categories of review and met the expectations in the other two categories.  He was not below expectations in any categories.  His next evaluation, given to him on March 31, 1995, is similarly positive.

Guilloty did not receive another evaluation until January 1996, months after he had met with Alvarez and Morales to complain about Sanchez and the Ponce district office.  The two evaluations he received in January 1996 were clearly negative.  In one evaluation, he received a positive remark in only one category -- personal appearance.  He received "unsatisfactory" remarks in all other categories of evaluation.[14]  The second evaluation he received that month, supposedly the final evaluation of this probationary period, revealed unsatisfactory marks in three categories of evaluation.  Hence, on this record, as a matter of sequence, the evaluations Guilloty received <u>after</u> he met with Directors Alvarez and Morales to complain about Sanchez and other officers were

---

[13] While it is debatable whether this review is actually negative, the evidence indicates that Guilloty was upset enough by it to meet with his superiors to discuss it.

[14] The SIB changed the format of its evaluation forms in 1995. Instead of three evaluative categories -- "excels," "meets," or "does not meet" expectations -- the new form had only two categories -- satisfactory or unsatisfactory.

markedly lower than the evaluations he received before those meetings. The proximity in time between the protected activity and the alleged retaliation is circumstantial evidence of motive. Ulrich v. City and County of San Francisco, 308 F.3d 968, 980 (9th Cir. 2002); Pike v. Osborne, 301 F.3d 182, 185 (4th Cir. 2002).

The defendants testified that the ratings in Guilloty's January 1996 evaluations were supported by a series of memoranda Sanchez had written to Alvarez chronicling Guilloty's problems in Ponce. As discussed above, Sanchez first memorialized in a memo to Alvarez written in September 1994 a series of problems Ponce district agents had with Guilloty. Between March 1995 and May 1995, Sanchez wrote an additional four memos (not shown to Guilloty until over a year later) chronicling Guilloty's allegedly inappropriate behavior on the job, including Guilloty's unauthorized use of an official automobile, his use of a flash camera during a nighttime surveillance, and his sleeping in the backseat of a police car while another agent drove to and from a surveillance. But even though Sanchez had been complaining about Guilloty's conduct since September 1994, Guilloty received positive evaluations from Sanchez in both December 1994 and March 1995.[15]

_____

[15] As discussed earlier, the first evaluation Guilloty received after he was assigned to Ponce was somewhat negative -- it reported that he "did not meet" expectations in two categories. Guilloty complained about the conclusions in this evaluation, and he met with Sanchez and Alvarez to discuss it. After that meeting, Guilloty took his complaint no further. As this first evaluation purported to cover the period from April 22 to June 22, 1994, and

-28-

He did not receive a negative evaluation until January 1996, after he spoke with Alvarez and Morales. While the irregular and inappropriate incidents described in Sanchez's memos may have justified Guilloty's negative evaluations in January 1996, so too would those incidents have justified negative evaluations in December 1994 and March 1995. Sanchez, though, refrained from giving Guilloty negative evaluations until after Guilloty spoke out against him and other agents in Ponce. Considering the proximity of Sanchez's change of attitude to Guilloty's complaints, we must find that Guilloty introduced sufficient evidence of motivation to shift the burden of persuasion under Mt. Healthy to the defendants.

In order to defeat Guilloty's claim, the defendants had to articulate a non-discriminatory ground for his negative evaluations and the extension of his probationary period, and prove by a preponderance of the evidence that Guilloty would have received those evaluations and the extension even in the absence of his complaints to Alvarez and Morales. See Acevedo-Diaz, 1 F.3d at 66. The structure of the analysis under Mt. Healthy -- giving the defendants the opportunity and the burden to rebut the causal link the plaintiff previously established -- allows the court to root

---

was given to Guilloty on October 14, 1994, it is unclear whether any of the events identified in Sanchez's September 20, 1994, memo to Alvarez occurred during this evaluation period. It is clear, though, that the incidents described in Sanchez's memo had occurred by the time Sanchez evaluated Guilloty for the second time. This second evaluation covered the period from July 15 to October 6, 1994, and it was delivered to Guilloty on December 12, 1994.

out those cases in which retaliation may have been one factor, but was not the only justification for the employment action. As the Supreme Court unequivocally stated in Mt. Healthy, "the fact that the protected conduct played a 'substantial part' in the actual decision" would not necessarily amount to a constitutional violation. 429 U.S. at 285. The court must assess the role that other factors played in the employment decision. In Mt. Healthy, for example, the Court considered the lower court's decision that an employee whose contract was not renewed after he exercised his First Amendment rights was entitled to reinstatement because he had proved that retaliation played a "substantial part" in the employer's decision. Id. at 276.

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision -- even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. . . . [An employee] ought not be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct

-30-

makes the employer more certain of the correctness of its decision.

Id. at 285-86; see Acevedo-Diaz, 1 F.3d at 66 ("[T]he . . . 'Mt. Healthy defense' ensures that a plaintiff-employee who would have been dismissed in any event on legitimate grounds is not placed in a better position merely by virtue of the exercise of a constitutional right irrelevant to the adverse employment action."). Therefore, we must carefully consider the defendants' contentions that Guilloty's conduct while an agent in the Ponce district office justified his negative evaluations and the extension of his probationary period.

The district court found that Guilloty "committed errors and demonstrated poor judgment" during his first two years as an agent in the Ponce district office. In its written opinion, the court summarized the evidence presented at trial:

> For example, [Guilloty] used a flash camera during a nighttime surveillance, jeopardizing both the investigation and the lives of the agents involved. In an undercover operation in Villalba, he attempted to make direct contact with the principal target of the investigation. One agent's uncontradicted testimony stated that this conduct put at risk the operation's success, as well as the safety of SIB agents. In another undercover operation, he revealed to a subject information about the workings of the SIB which made it obvious that Guilloty had to have been an agent. And in the course of another investigation, Guilloty was to drive to Cabo Rojo with other agents. He was instructed to be vigilant and on the look-out for certain suspects. Instead, he slept in the car ride out and back.

. . . .

> There was also uncontradicted testimony that Guilloty handled confidential informants improperly. . . .

Guilloty-Perez, slip op. at 5-6.  After an independent review of the evidence presented at trial, we conclude that the district judge's summary of the evidence was correct.  In addition to the testimony of Guilloty's supervisors and fellow officers, the defendants introduced the report of the internal investigation conducted by Agent Juan Reyes, a man with no ax to grind.  Reyes testified that the "errors and incidents of poor judgment" articulated in Sanchez's memos to Alvarez could be corroborated by Guilloty's fellow agents.  At the time he completed his investigation in August 1995, Reyes recommended that these incidents should be referred to the Inspector General of the Department of Justice.

At trial, Guilloty tried to question the accuracy of the Reyes investigation by having two of the agents Reyes interviewed explain their remarks as constructive criticism instead of the outright criticism and lack of faith Reyes portrayed them to be. Guilloty summarized their testimony in this same way in his brief on appeal.  Nevertheless, even if Agent Reyes interpreted these agents' statements more negatively than they were intended, Agent Reyes is not a defendant here.  The defendants are Sanchez, Alvarez, Morales and Pierluisi, who, after reading the report of

Reyes' investigation, had no reason to question its reliability and no reason to believe that his investigation did not support the negative evaluations of Guilloty's work by Sanchez and Guilloty's continued probationary status. Even if Guilloty's whistleblowing activity caused anger among his superiors and ultimately satisfaction among them over Guilloty's unhappiness with the negative evaluations and the prolonged probation, the existence of the Reyes report compels the conclusion that no reasonable jury could have found that Guilloty would not have received the same negative evaluations and extended probation even in the absence of his protected activity. Therefore, the district court ruled correctly in taking his section 1983 claim from the jury and entering judgment for the defendants.

Affirmed.

**Appendix: Important Dates and Events**

February 1994          Guilloty begins training with the Department
                       of Justice.

May 1994               Guilloty completes training and is assigned
                       to the Ponce district office.

June/July 1994         Guilloty begins to suspect that Ponce
                       district agents are receiving bribes from the
                       owner of a local stable.

August 1994            Guilloty receives information about an
                       incoming drug shipment and a corrupt police
                       officer assisting drug traffickers. Guilloty
                       reports this to his supervisor, Sanchez.

September 1994         Sanchez authors memo to Director Alvarez
                       detailing a number of complaints Guilloty's
                       fellow agents raised about his conduct.
                       Alvarez forwards this memo to SIB Director
                       Morales.

October 1994           Guilloty receives first evaluation from
                       Sanchez describing average to below average
                       conduct.

December 1994          Guilloty receives a generally positive second
                       evaluation.

March 1995             Sanchez authors memo to Alvarez detailing
                       Guilloty's improper conduct as an agent.

March 1995             Guilloty receives third evaluation, also
                       generally positive.

March-May 1995         Sanchez authors at least four additional
                       memos outlining problems he is having with
                       Guilloty. Alvarez directs Agent Juan Reyes
                       to investigate the allegations of these memos
                       and the September 1994 memo.

April-May 1995         Guilloty becomes aware that Agent Maximino
                       Rivera Laporte allegedly filed a false sworn
                       statement to support the seizure of an
                       automobile. Guilloty reports this to
                       Sanchez.

| | |
|---|---|
| May 1995 | Guilloty meets with Alvarez and tells him that Sanchez mishandled a drug importation investigation, and that Agent Rivera Laporte filed a false statement. |
| August 1995 | Guilloty meets with Morales and tells her about the same three irregularities he reported to Alvarez three months earlier. |
| August 1995 | Juan Reyes completes the investigation of charges against Guilloty listed in Sanchez's memos and declares that the allegations were corroborated by Guilloty's fellow agents. |
| January 1996 | Guilloty receives two highly negative evaluations from Sanchez. In response, Guilloty writes a letter to Alvarez, Morales and Secretary Pedro Pierluisi stating his objections to the results of these evaluations and suggesting they were written in retaliation for his reporting of irregularities to Alvarez and Morales. |
| September 1996 | Guilloty meets with Sanchez, Alvarez, and Morales to discuss the evaluations. He is presented with Sanchez's series of memos outlining Guilloty's problems as an agent. |
| October 1996 | Guilloty is transferred out of the Ponce district office. |
| November 1996 | Local newspaper El Vocero publishes a series of articles outlining alleged irregularities in the Ponce office of the Department of Justice. Guilloty is the inside source for these articles. |