BOUDIN, Chief Judge.
In the district court, the plaintiff Ber-nabé Tejada Batista (“Tejada”) recovered damages against two of his superiors in the Puerto Rico Justice Department (“PRJD”) for instigating Tejada’s discharge in violation of his First Amendment rights. The underlying events are easily described; the complications arise out of governing legal doctrine.
In 1987, Tejada began working as a law enforcement agent in the Special Investigations Bureau (“the bureau”) of the PRJD. After other stints, Tejada was assigned in 1995 to the bureau’s organized crime division, where he operated undercover, infiltrating Dominican drug trafficking rings. According to Tejada’s later testimony, he came to be troubled by certain “irregularities”: drug busts called off on the eve of arrest, without explanation; misuse of funds by another agent; and shady dealings by a government informant named Ivan Merced.
Tejada reported these concerns to Antonio Franco (his supervisor) and to the two higher officials later held liable to Tejada in this case: Domingo Alvarez (division head) and Lydia Morales (bureau director). No action was taken in response to his complaints. Worse still, a trafficker named Hernandez told Tejada that Merced had disclosed to gang members Tejada’s identity as an undercover officer. When Tejada so advised Franco, Franco threatened to discipline Tejada for speaking to Hernandez without authorization.
Thereafter, a hit man whom Tejada had helped put in prison was released and, Tejada believed, began to search for Teja-da. Fearing for his family’s safety and his own, Tejada asked Franco for a transfer out of his division. Tejada then wrote to Morales, setting forth his complaints about Merced, the threat the latter posed to investigations, and the threat posed by the hit man.
Morales responded by transferring Teja-da into what Tejada described as a dead-end job at bureau headquarters, one that often left him without any work to do. After receiving a number of threatening phone calls at his home, Tejada contacted Franco and Alvarez, who did not respond to his concerns. In May 1996, Tejada was activated for National Guard duty; Morales accused him of abusing military leave and withheld his pay. Eventually, in January 1997, Tejada moved his family to Florida at his own expense.
In December 1996, Tejada, while still on leave, spoke with a reporter for the El Vocero newspaper; on December 10, a short article appeared, entitled “S.I.B. Director and Assistant Denied Agent Transfer Although His Life Was in Danger.” The next day, another appeared with the title, “Domingo Alvarez of the S.I.B. Forbids Arrest in Drug Transactions.” The articles touched on the problems Tejada had complained of internally; each cited Tejada as a source.
The first short article, in substance, reported that Morales and Alvarez failed to *99 protect Tejada despite threats on his life; that when he was transferred, it was only to an “inoperative section”; that Alvarez quashed another agent’s complaint by threatening a transfer like Tejada’s; and that Tejada had no regular car to use while at his new job, since the bureau prohibited agents from using their private cars and claimed that there were insufficient ears available.
The second article alleged that Alvarez once suddenly and without explanation cancelled an imminent drug bust. It also said that a certain “Ivan Rodriguez” — a disguised name for the informant Ivan Merced — had blown Tejada’s cover, “ruined” expensive investigations, was “negotiating drug transactions” without authorization from the bureau, and “was working for the Bureau and for the underworld.” It described one investigation involving Merced as follows (in translation):
[Tejada] alleges that the confidant ruined an investigation in which a 50 kilos (which is valued at about $250,000) transaction was going to be made and “which was going great and overnight it was rained.”
On the day the second article appeared, Alvarez sent Morales a memorandum recommending Tejada’s discharge on the basis of his leaks, saying that they endangered both an investigation that was “still open” and the life of the informant. The next day, Alvarez wrote another memorandum to Morales, again recommending discharge — this time prompted (supposedly) by an anonymous tip saying that Tejada had, in 1993, been convicted of domestic abuse. Whether Alvarez had earlier known of the conviction was disputed.
The 1993 conviction, which occurred while Tejada was on military leave, resulted from Tejada’s hitting his wife, but it had been formally expunged by court order when Tejada completed a rehabilitation or “diversion” program. Alvarez’s memorandum to Morales mentions the diversion program, but not that its completion entailed erasure of Tejada’s conviction (even though he later testified that he knew diversion entailed expungement).
Morales, who was stepping down as bureau director, passed both of Alvarez’s memoranda — one about the leaks, the other about the past conviction — to the incoming acting director (Morales’ own former deputy), Miguel Gierbolini. On February 4, 1997, Gierbolini recommended to the newly appointed Secretary of Justice, José Fuentes Agostini, that Tejada be discharged for the 1993 domestic violence conviction on the ground that someone with this record should not be a police agent.
Fuentes signed Tejada’s termination papers on February 27, 1997; Tejada, still on military leave, learned of this in early March, and an informal agency hearing was held on November 17, 1997. The hearing officer recommended discharge because the conduct leading to Tejada’s conviction represented, in violation of the bureau’s regulations, “improper behavior or [behavior] damaging to the good name of the agency or the Government of Puerto Rico” and “commission of acts for which is charged or may be charged a felony or misdemeanor crime.”
Tejada brought suit in federal district court, seeking damages and injunctive relief under section 1983, 42 U.S.C. § 1983 (2000), for violation of his First Amendment rights. Named as defendants were Fuentes, Morales, Alvarez, Gierbolini, Franco, two other supervisors named Cris-tobal Irrizary and Ernesto Fernández, and an unnamed PRJD employee. Defense motions for summary judgment based on qualified immunity were denied, but the court eventually dismissed the claims *100 against Fuentes, Fernández, and Irrizary for lack of evidence to support liability.
In dismissing the claim against Fuentes, the judge said that the evidence was insufficient as to motive, as it “point[ed] to” a “very valid, nondiscriminatory reason.” He later explained in a written opinion:
Nothing in the plaintiffs evidence established that [Secretary] Fuentes Agosti-ni’s motivation for signing the termination letter was in any way related to the publication of the newspaper articles or plaintiffs denouncement of corruption.
Instead, the evidence showed that Fuentes had merely “signed the termination letter adopting a recommendation” based on Te-jada’s prior conviction.
As to the remaining defendants, the judge wrote that “[t]here is sufficient evidence ... from which a reasonable trier of fact could find in favor of plaintiff.” He noted Tejada’s internal complaints of corruption, appellants’ inaction, the timing of Alvarez’s memoranda, the possibility that Alvarez had long known of the conviction, and Morales’ role in forwarding the memo-randa to Gierbolini. In other words, the judge thought that their motive could be deemed retaliatory.
On February 27, 2003, after a four-day trial, the jury returned a verdict against Morales and Alvarez, assessing damages of $125,000 for Tejada’s lost income. The district court denied post-trial motions for judgment in favor of the defendants, a new trial, and remittitur. Morales and Alvarez now appeal, contesting both the verdict against them and the amount of damages.
The appeal implicates several different bodies of court-created law, beginning with the cause of action itself. Although the section 1983 cause of action is statutory, the substance of the claim here derives from Supreme Court precedents construing the First Amendment. In a nutshell, the Pickering/Connick line of decisions forbids officials from firing an employee for “protected speech” unless under a balancing test the governmental interests outweigh the need for protection.[1]
The claim thus turns in the first instance on the nature of the speech, the balancing of interests, and the motivation for the firing. In this instance, the defendants concede for purposes of this appeal that Tejada’s “speech” — his disclosures to the reporter — was at least in part protected speech under the governing case law. The disclosures, indeed, involved alleged serious mismanagement and possible corruption in the bureau, see Guilloty Perez v. Pierluisi, 339 F.3d 43, 52-53 (1st Cir.2003), and they occurred only after Tejada had properly sought relief through internal complaints, cf. Wagner v. City of Holyoke, 404 F.3d 504, 508 (1st Cir.2005) (per curiam).
The “balancing” — ordinarily a question of law for the court — is a much closer question. The defendants argue that Te-jada potentially endangered the life of an informant (Ivan) and could have jeopardized ongoing investigations. This solicitude may appear to contrast with defendants’ own limited interest in Tejada’s safety. Furthermore, only Ivan’s first name was revealed, and Ivan was himself *101 in jail (for unauthorized drug dealing while acting as an informant) by the time of the newspaper reports.
Nevertheless, had Tejada been fired because he revealed information jeopardizing an informant and an ongoing investigation, defendants would have an excellent argument that Tejada was fired for unprotected speech. See United States v. Chagra, 701 F.2d 354, 365 (5th Cir.1983). However, so far as Morales and Alvarez were responsible for the firing — a separate question to which we will return — the jury could on the evidence before it conclude that their motives were not based on these concerns about Ivan and the investigation, but that they acted because of Tejada’s protected speech.
Tejada’s main disclosures were of mismanagement and possible corruption; hostility to him had been demonstrated because of his internal complaints well before his newspaper disclosures; and the addition of the domestic violence charge could have been viewed as a gratuitous gesture undermining the claim by appellants that they were centrally concerned with the threat to Ivan or ongoing investigations. In short, the jury could have concluded that the appellants acted because of Teja-da’s protected speech.
The focus of the appellants’ brief, so far as liability is concerned, is on a multi-step claim: that Fuentes, not the appellants, fired Tejada; that Fuentes did so on an entirely different ground unconnected with protected speech; and that these circumstances insulate the appellants from liability under the so-called Mt. Healthy defense, which arises where the firing would have occurred even without the protected speech. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).
To start with the factual premises, we agree that Fuentes purported to discharge Tejada because of the domestic violence conviction, and for the present appeal we accept that this was indeed Fuentes’ ground. This is not because the district court’s ruling to this effect binds us, as appellants assert, but because there is no direct evidence that Fuentes acted on any other ground.[2] A circumstantial case to the contrary might be attempted (based on implausibility), but it would not be easy and Tejada does not attempt such an attack on appeal.
Strictly speaking, Mt. Healthy is not on point here. It deals with actions taken by an official or agency out of “mixed motives.” It says, in substance, that where there was a permissible and impermissible ground for a firing, the impermissible ground should be ignored where the employee would have been discharged anyway based on the permissible motive. Although clear policy considerations are invoked, the main rationale is that in such a case the impermissible ground was not a but-for cause of the firing; it would have happened anyway. 429 U.S. at 285-87, 97 S.Ct. 568.
Thus, Mt. Healthy comports with the traditional tort-law principle that if the wrongful act did not cause the injury, the wrongdoer is not liable. See Prosser & Keeton on Torts, § 41 at 263 (5th ed.1984). *102 By contrast, in this case, the actions of the appellants were a “but-for” cause of Teja-da’s firing. The jury could easily have concluded that Tejada would not have been fired if appellants had not disclosed Teja-da’s prior conviction and passed along the recommendation to Fuentes. The appellants’ actions were also surely a “proximate cause” as well, in the sense that the result was foreseeable (indeed, desired).
So the problem in this case is not one of a single actor with multiple motives, but of sequential actors having different motives — the first actor’s motive being unlawful and the second actor’s motive at least permissible. In such a case, the first actor may be (and here was) a but-for cause of the firing. The question is whether the intervening step — a final decision maker acting on a permissible ground — should as a matter of policy (not lack of causation) insulate the wrongdoer from liability.
We have found only a few circuits that have addressed this sequence-of-actors issue in the present context, and they are nominally in conflict. The Fifth Circuit says that the final action by the properly motived superior insulates the ill-motivated subordinate, Beattie v. Madison County Sch. Dist., 254 F.3d 595, 603-05 (5th Cir.2001); three other circuits say that the subordinate remains liable if he is a but-for cause of the firing, Gilbrook v. City of Westminster, 177 F.3d 839, 854-56 (9th Cir.1999), cert. denied, 528 U.S. 1061, 120 S.Ct. 614, 145 L.Ed.2d 509 (1999); Saye v. St. Vrain Valley Sch. Dist., 785 F.2d 862, 867 (10th Cir.1986); Hickman v. Valley Local Sch. Dist. Bd. of Educ., 619 F.2d 606, 610 (6th Cir.1980). Whether any of these cases intends a wholly mechanical rule in all cases is open to doubt.
Our own recent decision in Webber v. Int’l Paper Co., 417 F.3d 229 (1st Cir.2005), far from assisting appellants, appears to assume arguendo that a tainted adverse recommendation from a supervisor to a superior might create liability even if the superior’s own motive was pure. Ultimately, the court did not decide the issue; it found that (unlike the present case) the superior had determined to terminate the employee on legitimate grounds before any contact with the supervisor and that the supervisor had no causal influence on the firing.
In any case, a rigid rule would not comport with sound policy.[3] Suppose that the appellants had disclosed that Tejada was taking payoffs from the mob and Fuentes had discharged Tejada on that basis; it is hard to imagine any court upholding damages to Tejada for the firing, even if appellants’ motives were unlawful. Conversely, suppose in retaliation for protected speech the appellants misled Fuentes into thinking that Tejada had shirked his duties; surely they should be held liable even if Fuentes’ own motives were innocent.
Our case falls between such extremes. Even accepting that Fuentes’ own motive was “pure,” a jury could reasonably doubt that the firing would have occurred if Fuentes had stumbled across the prior conviction on his own. Appellants cite authority under Puerto Rico law for discharging a police officer for domestic abuse. But here Tejada’s conviction was over three years old, and the conviction had been expunged under local law after he had received counseling. It is highly unlikely that absent the appellants’ prompting, the firing was inevitable.
*103 Nor was Tejada’s misconduct of such a kind that would make it unthinkable to retain him as a policeman after its disclosure, as would be the case if he were guilty of mob ties or murder. His misconduct was serious, to be sure; but it was one incident, well in the past, and Tejada had been rehabilitated. This is not a case in which it offends public policy to sanction a defendant who, for improper reasons, revealed Tejada’s earlier offense in order to prompt his discharge.
Appellants make a final merits-related claim of qualified immunity. The interplay between qualified immunity and First Amendment violations is a difficult subject, partly because the former normally employs an objective standard and the latter — in contrast to the ordinary Fourth Amendment claim — turns heavily upon motive. This does not mean that qualified immunity can never succeed in a First Amendment case, see Dirrane v. Brookline Police Dept., 315 F.3d 65, 69-71 (1st Cir.2002), but only that the opportunities may be narrowed.
On appeal, appellants’ brief describes qualified immunity doctrine in general terms but makes no effort to apply it to the facts of this case. An argument not seriously developed in the opening brief is forfeit, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990), cert. denied, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990), and that rule certainly applies in this case. Given that the jury almost surely found that appellants’ purpose was improper retaliation, it is not clear how a qualified immunity defense could easily have prevailed.
As for damages, the award of damages corresponds to Tejada’s lost police salary between the period of his discharge and the date of judgment in this case. Appellants say that the jury should have subtracted amounts Tejada apparently earned from other odd jobs during this period (for example, at a gasoline station). But it might well have been for appellants to elicit such proof, cf. Conetta v. Nat’l Hair Care Ctrs., Inc., 236 F.3d 67, 77 (1st Cir.2001) (mitigation), and they may be fortunate not to have been held liable for future wages as well.
The district court has detailed the relevant evidence and calculations that may have led a jury rationally — even “conservative[ly]” — to set compensatory damages at $125,000. Faced with the “formidable burden” of showing that the district court abused its discretion in rejecting their motion for remittitur, Davignon v. Clemmey, 322 F.3d 1, 11 (1st Cir.2003), appellants have not come close.

Affirmed.

. See Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, 391 U.S. 563, 564, 88 S.Ct. 1731, 1732-33, 20 L.Ed.2d 811 (1968); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 281-82, 97 S.Ct. 568, 573-74, 50 L.Ed.2d 471 (1977); Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 411-13, 99 S.Ct. 693, 694-95, 58 L.Ed.2d 619 (1979); Connick v. Myers, 461 U.S. 138, 140-41, 103 S.Ct. 1684, 1686-87, 75 L.Ed.2d 708 (1983); Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr, 518 U.S. 668, 670, 116 S.Ct. 2342, 2345, 135 L.Ed.2d 843 (1996).

. Although appellants say that the dismissal of Fuentes created "law of the case" that settles the question on appeal, this reflects a basic misunderstanding of the doctrine. The branch of the doctrine invoked here is simply a prudential (but not obligatory) rule that the same court will ordinarily not revisit an earlier ruling made in the same case. See Conley v. United States, 323 F.3d 7, 12 (1st Cir.2003) (en banc). The doctrine does not determine whether the district court's ruling as to Fuentes is correct nor bar a challenge to it on this appeal.

. Section 1983, as we have already noted, provides only a skeletal civil remedy for violations of federal law. Much of the remedial law under section 1983 is court made, see Chemerinsky, Federal Jurisdiction § 8.11, at 578-85 (4th ed.2003), and the kind of interstitial problem presented here is especially suited for development through case law.