Brian PAROW, Michael Buckley, Galen Yoshizumi, Patrick Feran, James Varzakis, William Sullivan and Steve Carroll

v.

Neil KINNON, Individually and in his official capacity as Commissioner of the Malden Fire Department, Richard Howard, Individually and in his official capacity as Mayor of the City of Malden, Massachusetts, and City of Malden, Massachusetts

No. CIV.A. 02–12223–RGS.

United States District Court, D. Massachusetts.

Jan. 22, 2004.

Harold L. Lichten, Pyle, Rome Lichten
& Ehrenberg, P.C., Boston, MA, for Brian
Parow, Michael Buckley, Plaintiffs.

Laurence J. Donoghue, Robert P. Morris, Boston, MA, for City of Malden, Neil Kinnon, Richard Howard, Defendants.

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR DECLARATORY RELIEF AND SUMMARY JUDGMENT

STEARNS, District Judge.

This First Amendment case pits seven Malden firefighters and their Union, Local 902 of the International Association of Fire Fighters (Union), against defendants Neil Kinnon, the Commissioner of the Malden Fire Department (Department), Richard Howard, the Mayor of Malden, and plaintiffs' employer, the City of Malden. Plaintiffs maintain that their constitutional right to free expression has been infringed by Department rules, regulations, and directives forbidding public comment on departmental matters. At the heart of the dispute is a struggle between the Union and City officials over the appropriate number of Malden firefighters to be called for duty on each shift. In November of 2002, the court entered a preliminary injunction ordering the Commissioner to withdraw a directive banning all non-approved advocacy signs from fire station premises and enjoining the Department from imposing discipline on firefighters who had displayed signs on their personal vehicles protesting a reduction in the minimum staffing level. Plaintiffs now ask the court to declare four of the Department's Rules and Regulations and two directives issued by the Commissioner unconstitutional, and to enter summary judgment on their claims of personal injury. The defendants oppose some, but not all, of the relief requested and seek a declaration that the reinstatement of a policy banning all signs of an advocacy nature from fire station premises is constitutionally permissible.

## BACKGROUND

In early 2002, Commissioner Kinnon and Mayor Howard, faced with burgeoning overtime costs in the City of Malden Fire Department,[1] announced plans to reduce the minimum manning level from twenty-two firefighters on a shift to eighteen, and to effectively eliminate the position of deputy aide.[2] Plaintiff Brian Parow, speaking on behalf of the Union, vociferously criticized the proposed staffing reduction in newspaper articles, paid advertisements, and leaflets distributed to Malden homeowners.

On a Saturday night in late August of 2002, the manning level fell below twenty-two firefighters. During the affected shift, a residential fire resulted in a homeowner's death. In reporting the fire, the Malden Advocate published an article containing the following excerpts.

> James Hattersley of Malden was pronounced dead at Melrose–Wakefield Hospital after a 9:40 p.m. fire which he is reported to have battled in the last moments of his life.... It was the first fire death in the City in over three and a half years. Hattersley's death comes in the midst of a debate over minimum manning and during a shift when the Department was operating at 21, a figure one shy of the minimum manning which fire officials stress is the lowest at which they can safely operate. Mayor Richard Howard has stated that mutual aide from other local fire departments ensures the quality of the Malden Fire

---

1. According to City officials, overtime expenditures in the Fire Department had risen from $225,000 in fiscal year 1997 to over $300,000 during the first half of the 2002 fiscal year.

2. The deputy aide is responsible for operating infrared equipment used at a fire scene to detect heat sources.

Department even when working below minimum manning.

On Saturday, the Department battled the fatal fire without the help of a deputy's aide whose duties include driving the deputy to the scene and operating a heat sensing camera capable of detecting fire extension as well as human bodies, according to Malden fire union representative Brian Parow.

"We're not going to play the game of could his death have been prevented, but there's some guy laying on a table right now," said Parow. "We're not going to say its because the aide wasn't there. But the aide has the camera. His job is to go in and find someone."

Within days of the article's appearance, Parow was given a written reprimand for violating a departmental policy banning public comment about a fire under investigation. Parow was allegedly told that if he ever "put an article in the Malden Advocate again," additional "actions may be taken." Plaintiffs' Memorandum, at 5. Parow suffered no loss of pay or benefits as a result of the reprimand.

Undaunted, Parow published an open letter in the Malden Advocate addressed to the residents of Malden. In the letter, Parow explained the Union's position on manning levels, outlined the Union's ongoing dispute with the City, and declared that the Union would not be intimidated from pressing matters further. Shortly thereafter, Parow was involuntarily transferred from fire suppression duty to a fire prevention post. Several days later, he was returned to his original position.

On November 1, 2002, Commissioner Kinnon issued a formal directive barring any payment of overtime so long as eighteen firefighters reported for work on a scheduled shift, and requiring the deputy aide to assume line duties whenever the manning level fell below twenty-one fire-fighters. The last full paragraph of the directive stated that:

> any new signs displayed on any station or its adjacent property regarding apparatus out of service, not previously authorized by the Commissioner, will result in the suspension of the Station Captain on duty and disciplinary action being taken against the working deputy depending on their knowledge of such signs.

On November 7, 2002, Union firefighters defied the directive by placing signs protesting the Commissioner's directive on their personal vehicles. The signs contained pictures and statements such as:

> September 11, 2001—22 Fire Fighters Minimum Now ... 18 Fire Fighter Minimum! How safe do you feel?

> What if you had a fire and no one could come?

> It's 2:00 a.m., your house is on fire, do you know where your fire truck is? Ask your Mayor!

Personal vehicles festooned with the signage were parked prominently on the street in front of the Malden fire station and in the adjoining parking lot. Plaintiffs contend that in the past firefighters had been permitted to display signs on their vehicles opposing Proposition 2½ and supporting political candidates, including candidates for school committee and mayor.

On November 8, 2002, plaintiffs Galen Yoshizumi, Michael Buckley, Patrick Feran, and James Varzakis were ordered to remove the signs from their vehicles. They refused and were given written reprimands together with a warning that further defiance of the signage ban would lead to more serious discipline. On November 10, 2002, Parow received a written reprimand and an order to remove a sign from his vehicle protesting the manning level reduction.

Chapter 5, Sections 6 and 7 of the Malden Fire Department's Rules and Regulations provide as follows.

Section 6. Members shall not present a petition relative to the administration of the fire department to the mayor or any member of the city council without notifying the commissioner and chief.

Section 7. Members or employees of the department shall not deliver addresses at public gatherings concerning the work of the department nor shall they under any circumstances make statements for publication concerning the plans, policies, or affairs of the administration of the fire department unless authorized to do so by the commissioner and chief.

Chapter 5, Section 25, states in pertinent part that a member of the Department shall not

[g]ive any information relative to fires except as otherwise provided in these Rules and Regulations [or] furnish information relative to the business or affairs of the department to persons not connected therewith, except as authorized by the chief.

In addition, Chapter 5, Section 37 provides that

[w]henever summoned or called before any court, board, or commission, outside of the department, for the purpose of investigation or any other reason involving a matter in which the department is in any way concerned, [a firefighter must] immediately notify the commissioner or chief of department.

On November 14, 2002, plaintiffs sought injunctive relief barring the defendants from enforcing the ban on protest signage and revoking the Commissioner's disciplinary actions. On November 26, 2002, this court ordered the withdrawal of the "final paragraph of the Commissioner's November 1, 2002 Memorandum prohibiting the display on fire station property of any non-approved sign protesting municipal staffing levels and budgetary decisions." The court further held that the order was "without prejudice to the City's right to ban all signage of an advocacy nature from fire station property without discrimination as to its contents." [3]

The City complied immediately with the court's order. In response to the court's observation that a content-neutral ban on all advocacy signage on fire department property might be constitutionally permissible, the City announced its intention to reinstate an April 26, 2002 directive issued

---

**3.** In its entirety, the court's November 26, 2002 Order reads as follows:

After a hearing held this day, the court grants the motion for a preliminary injunction in part. The City of Malden and the defendant Commissioner and Mayor are hereby *ORDERED* to withdraw the final paragraph of the Commissioner's November 1, 2002 Memorandum prohibiting the display on fire station property of any non-preapproved sign protesting municipal staffing levels and budgetary decisions. This *ORDER* is entered without prejudice to the City's right to ban all signage of an advocacy nature from fire station property without discrimination as to its contents. Defendants are further *ENJOINED* from instituting any disciplinary action based on the alleged violation of the unauthorized signage provision of the November 1, 2002 Memorandum or instituting any disciplinary action based on a firefighter's off-duty exercise of his or her First Amendment right to free expression on issues of public concern, including fire department staffing levels and budgetary decisions. Defendants are further *DIRECTED* to rescind any disciplinary action taken to date based on the alleged violation of the unauthorized signage provision of the November 1, 2002 Memorandum. Upon the parties' completion of discovery, the court will hear argument as to the constitutionality of Chapter 5, §§ 6, 7, 25 and 37 of the Malden Fire Department's Rules and Regulations.

by the Commissioner stating that "[n]o signs are to be displayed on Fire Department or City Property which are not official in nature. All future signs must now be approved by the Chief and Commissioner."[4]

Plaintiffs now ask that the court enter declaratory and summary judgment "on those aspects of defendants' conduct that the court enjoined in its November 26, 2002 Order." Specifically, plaintiffs request rulings that:

(1) Defendants' promulgation of the final paragraph of the November 1, 2002 Memorandum was unconstitutional because it prohibited the display on fire station property of any non-preapproved sign protesting municipal staffing levels and budgetary decisions; (2) that Defendants' discipline of Plaintiffs based on an alleged violation of the unauthorized signage provision of the November 1, 2002 Memorandum was unconstitutional; and (3) that Defendants' discipline of Plaintiff Parow for his exercise of his First Amendment right to free expression on issues of public concern, including fire department staffing levels and budgetary decisions, was unconstitutional.

Plaintiffs' Memorandum, at 13. Plaintiffs, as additional relief, ask that the court declare sections 6, 7, 25, and 37 of Chapter 5 of the Department's Rules and Regulations unconstitutional.

## DISCUSSION

### First Amendment Standing

Standing determines the power of a federal court to adjudicate the merits of a dispute. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

There are three fundamental requisites of standing

that every litigant invoking the jurisdiction of the federal courts must possess: (1) injury-in-fact—an invasion of a legally protected interest that is both concrete and particularized, and actual or imminent; (2) causation; and (3) redressability.... Several prudential considerations also infuse standing determinations. These considerations, which militate against standing, principally concern whether the litigant (1) asserts the rights and interests of a third party and not his or her own, (2) presents a claim arguably falling outside the zone of interests protected by the specific law invoked, or (3) advances abstract questions of wide public significance essentially amounting to generalized grievances more appropriately addressed to the representative branches.

*Benjamin v. Aroostook Medical Center, Inc.*, 57 F.3d 101, 104 (1st Cir.1995).

While a fundamental constitutional concept, the contours of the standing doctrine have been characterized as "a morass of imprecision." *New Hampshire Right to Life Political Action Committee v. Gardner*, 99 F.3d 8, 12 (1st Cir.1996). This is especially true in the First Amendment area where the high value placed on free public discourse has led courts to relax the normally stringent requirement that a litigant show an injury-in-fact as a prerequisite of suit.

■ The general rules governing First Amendment standing are easy enough to state, but depending upon the factual context, are often difficult to apply. Two types of actual injury give rise to First Amendment standing. The first is the

4. The Department has abstained from enforcing this directive during the pendency of the litigation. Defendants' Opposition, at 14 n. 3.

injury caused by the threat that the speaker will be prosecuted or otherwise punished for his or her speech. In this circumstance, plaintiffs "may have standing even if they have never been prosecuted or threatened with prosecution." *Mangual v. Rotger–Sabat*, 317 F.3d 45, 56–57 (1st Cir. 2003). It is the possibility of a punishment as the price of one's speech, whether or not the threat of being sanctioned is realized, that causes harm to the speaker. *New Hampshire Right to Life*, 99 F.3d at 13. While this type of injury is most often asserted by plaintiffs challenging the threat of criminal prosecution, *see Diamond v. Charles*, 476 U.S. 54, 65, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), it also applies when the threatened sanction takes the form of a regulatory or financial penalty. *See American Civil Liberties Union v. The Florida Bar*, 999 F.2d 1486, 1492 (11th Cir.1993) (standing recognized where plaintiff, a candidate for a judicial position, faced possible bar discipline for speech critical of his opponent). A second injury-in-fact occurs when a plaintiff foregoes expression in order to avoid a sanction or penalty. "In such situations, the vice of the [challenged] statute is its pull toward self-censorship." *New Hampshire Right to Life*, 99 F.3d at 14.

> Of course, these two types of injury are interrelated. Both hinge on the existence of a credible threat that the challenged law will be enforced. If such a threat exists, then it poses a classic dilemma for an affected party: either to engage in the expressive activity, then courting prosecution, or to succumb to the threat, thus forgoing free expression. Either injury is justiciable.

*Id.*

Whichever type of injury is asserted, the plaintiff must show more than a subjective or irrational fear that his or her speech will be sanctioned. *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.' "). Nonetheless, "the evidentiary bar that must be met is extremely low." *Mangual*, 317 F.3d at 57.[5]

■ Injury-in-fact is presumed when government imposes a prior restraint on expressive activity, although the prior restraint doctrine is applied only in cases involving government censorship schemes and judicial orders prospectively banning speech.

> The doctrine of prior restraint has its roots in the 16th and 17th century English system of censorship. Under that system, all printing presses and printers were licensed by the government, and nothing could lawfully be published without the prior approval of a government or church censor. *See generally* T. Emerson, *System of Freedom of Expression* 504 (1970). Beginning with *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), we expanded this doctrine to include not only licensing schemes requiring speech to be submitted to an administrative censor for prepublication review, but also injunctions against future speech issued by judges. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389–390, 93 S.Ct. 2553, 2560–2561, 37 L.Ed.2d 669 (1973) ("[T]he protection against prior restraint at common law barred only a system of administrative censorship.... [T]he Court boldly

---

**5.** Professor Tribe notes that the standing barrier imposed by *Laird's* "subjective threat" rule has been since treated by the Supreme Court as non-controlling *dicta*. 1 L.H. Tribe, *American Constitutional Law,* 413 & n. 89 (3d ed.2000).

stepped beyond this narrow doctrine in *Near* "). Quite obviously, however, we have never before countenanced the essentially limitless expansion of the term . . . .

*Alexander v. United States,* 509 U.S. 544, 553 n. 2, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993).[6]

■ Finally, a fourth category of speech restriction triggers automatic standing regardless of any showing by a plaintiff of a personal injury. "It is well established that in the area of freedom of expression an overbroad regulation may be subjected to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). " '[L]itigants ... are permitted to challenge [an overbroad] statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.' " *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 392–393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). *See New England Regional Council of Carpenters v. Kinton,* 284 F.3d 9, 18–19 (1st Cir.2002) ("Under [this] rule, leafletters may facially challenge permit schemes despite the fact that they have neither applied for a permit to distribute handbills on a particular street nor made definitive plans to do so.").

■ With respect to the Department's Rules and Regulations, defendants by and large limit their opposition to the alleged lack of a "present case or controversy" giving rise to standing on plaintiffs' part. This is so, according to the Commissioner, because during his tenure "no employee has been disciplined, reprimanded, or in any way accused of misconduct for violating these [regulations]." Kinnon Aff. ¶ 15. Nor, according to defendants, is there any "immediate threat" that a plaintiff will be cited for such a violation. Defendants' Opposition, at 13. Finally, defendants argue that there is no evidence that the regulations (or the Commissioner's directives) have had any chilling effect on plaintiffs' speech. If anything, defendants postulate that the regulations have served only to incite plaintiffs to speak louder.

That plaintiffs have standing to challenge the Department's regulations, either because they have suffered an injury-in-fact, or because the regulations are in some aspects facially overbroad, would seem apparent. The harm to plaintiffs is not speculative or conjectural—they received written reprimands from the Commissioner for engaging in expressive conduct that was specifically banned by the regulations. While defendants make the technical point that plaintiffs were disciplined for violating the Commissioner's November 1, 2002 directive (the invalidity of which defendants concede), and not the regulations *per se,* it is clear that the authority for the Commissioner's directive (requiring prior approval for the posting of political signs) was derived from the substance of sections 6, 7, and 25 of the regulations (requiring prior approval to engage in petitioning activity or to comment publicly on fires or the administration of the Department). It is true that plaintiffs suffered no loss of pay, benefits, or position as a result of the Commissioner's reprimands, but it can be fairly assumed that the reprimands (had they not been successfully challenged), would have impacted on the plaintiffs' future prospects for pro-

6. Not all government permitting schemes, it should be noted, fall under the doctrine. *See Thomas v. Chicago Park Dist.,* 534 U.S. 316, 322–323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002).

motion or transfer to more desirable assignments. Moreover, while the Commissioner abjures any intention of enforcing the regulations in the future, it is always open to him (or his successor) to change his mind. *See Chamber of Commerce v. Fed. Election Com'n,* 69 F.3d 600, 603 (D.C.Cir.1995).[7]

■ Even absent an injury, plaintiffs would have standing to mount a challenge to the regulations under the established rule that "in the area of freedom of expression an overbroad regulation may be subject to facial review." *Forsyth County,* 505 U.S. at 129, 112 S.Ct. 2395. This is especially true where government seeks to promote discipline in the workplace not by taking action in response to an employee's actual speech, but by banning all speech by all employees before it happens. *United States v. National Treasury Employees Union,* 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (striking down an Ethics in Government Act provision prohibiting federal employees from accepting compensation for making speeches or writing articles).

*The Regulations*

■ Because defendants, other than contesting standing, have chosen not to present a developed defense of the legality of the disputed regulations, a brief statement of settled law will suffice. That the right of public employees to petition political authorities over job-related grievances is protected First Amendment activity is not open to dispute. *United Mine Workers of America, Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ("We start with the premise that the rights to assemble peaceably and to petition for a redress of griev-

ances are among the most precious of the liberties safeguarded by the Bill of Rights."). A regulation conditioning that right on obtaining the prior permission of the public employer is presumptively invalid. Consequently, I conclude that section 6 of the Department's Rules and Regulations does not comply with the First Amendment.

■ A person who undertakes government employment does not relinquish the First Amendment right that he or she would enjoy as a citizen to comment on matters of public interest. *Pickering v. Board of Ed. of Township High School, Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Courts, while protective of an employee's right to free expression, also recognize that a government employer has a countervailing interest in insuring the efficient delivery of government services and may impose restrictions on employee speech that interferes with that mission. *Guilloty Perez v. Pierluisi,* 339 F.3d 43, 52–53 (1st Cir. 2003). When employee speech touches on matters of public concern, *Pickering* establishes a test intended to balance the competing interests at stake.

First, the court must determine whether [the plaintiff] made her statements as a citizen upon matters of public concern. . . . Second, the court must weigh the strength of the employee's and the public's First Amendment interests against the government's interest in the efficient performance of the workplace. Third, if the employee's and the public's First Amendment interests outweigh a legitimate governmental interest in curbing the employee's speech, [the plaintiff] must show that the protected expression was a substantial or motivat-

---

**7.** The extent to which the plaintiffs were "chilled" in the exercise of their right to free speech may be a matter of debate. There is, however, some suggestion in the record that other firefighters were intimidated from giving vocal support to the Union's position on the change in the staffing policy.

ing factor in an adverse employment action.

*Tang v. State of R.I., Dept. of Elderly Affairs,* 163 F.3d 7, 12 (1st Cir.1998) (citations omitted). The public interest qualification is important. The *Pickering* test is triggered only when the employee speaks "as a citizen upon matters of public concern," rather than "as an employee upon matters only of personal interest." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Thus, speech that is limited to complaints about one's status in the workplace or the habits and practices of a supervisor "may give rise to discipline without imposing any special burden of justification on the government employer." *National Treasury,* 513 U.S. at 466, 115 S.Ct. 1003.[8]

Defendants, to be fair, do not entirely concede the point. Observing that the dispute over staffing has its roots in an acrimonious collective bargaining relationship between the Union and the City, defendants make the passing argument that a dispute of fact exists as to whether plaintiffs "expressed themselves as employees, in support of their labor union's position, and not as citizens, addressing a matter of public concern." Defendants' Opposition, at 12. This argument, which has plausibility, is directed at the plaintiffs' motive for speaking. While it would be naive to assume that concern over overtime pay and jobs played no role in shaping plaintiffs' position on the staffing issue, their speech was directed to the impact of the reduction in manning levels on public safety. The threat of terrorism aside, one would be hard pressed to imagine a topic of greater public concern than fire safety and the capacity of a municipal fire department to respond to emergencies. Indeed, the First Circuit has held that "commentary on the available fire protection within the [community] and [local government] actions in dealing with related problems is a prototypical matter of public concern." *Brasslett v. Cota,* 761 F.2d 827, 844 n. 14 (1st Cir.1985). Whether the plaintiffs' motive in raising the staffing issue was altruistic, as they contend, or selfish, as the defendants maintain, is somewhat beside the point. The First Amendment is concerned with speech, not the motivation of the speaker.[9]

Defendants make a second argument, that "given the paramilitary nature of

---

**8.** Plaintiffs argue that *National Treasury* supplants *Pickering* with a newly defined "heightened burden" test that applies when a governmental restriction on speech takes the form of a prior restraint. I think this reads too much into Justice Stevens' observation in *National Treasury* that "the Government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action." *National Treasury,* 513 U.S. at 468, 115 S.Ct. 1003. Justice Steven's point was that where a statutory ban on speech affects a broad class of present and future employees, the usual presumption of validity accorded to a congressional judgment does not apply. Thus, the government's burden of justifying the congressional ban that figured in *National Treasury* was heavier than in the typical *Pickering* case where the prior speech of a single employee is at issue. Justice O'Connor makes clear in her concurring and dissenting opinion that "[t]he time-tested *Pickering* balance ... provides the governing framework for analysis of all manner of restrictions on speech by the government as employer." *Id.* at 480, 115 S.Ct. 1003. (O'Connor, J., concurring in judgment, dissenting in part). While acknowledging the "meaningful distinction" drawn by Justice Stevens between *ex ante* prohibitions and *ex post* punishments of discrete instances of misconduct, according to Justice O'Connor, "reliance on the *ex ante/ex post* distinction is not a substitute for the case-by-case application of *Pickering*." *Id.* at 481, 115 S.Ct. 1003.

**9.** There is no contention that any of the plaintiffs were confidential employees whose speech on internal departmental matters might have been permissibly restricted as a result. *See Flynn v. City of Boston,* 140 F.3d 42, 47 (1st Cir.1998).

a[f]ire [d]epartment, the Malden Fire Department has a greater interest than other public employers in regulating speech." Defendants' Opposition, at 12. As a general proposition this is true. Courts have traditionally given greater deference to police agencies and fire departments in scrutinizing restrictions on speech than to other government employers.

> The importance of discipline, maintenance of harmony among coworkers, and close working relationships requiring personal loyalty and confidence is greater in the context of a law enforcement agency ... than it might be in another type of government agency. *See Conaway*, 853 F.2d at 798 (comparing a police department to a building inspection agency); *see also Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir.2000) (recognizing the "heightened need for order, loyalty, morale and harmony" in a police department); *Moore*, 57 F.3d at 934 (same). Therefore, courts must be sensitive to the needs of law enforcement agencies in disciplining an employee whose expressive conduct interferes with these interests.

*Guilloty Perez*, 339 F.3d at 53–54. These concerns, however, are more relevant to discipline in the workplace than they are to plaintiffs' expressive activities when off the job. Defendants have offered no evidence that plaintiffs' public speech has had a detrimental effect on departmental morale or discipline. Mayor Howard, Commissioner Kinnon, and former Fire Chief LaFrenier testified candidly at their depositions that they have no concrete evidence that plaintiffs' conduct (to date) has had a deleterious effect on the operations of the Department.[10]

■ Thus, I conclude that section 7 of the Department's Rules and Regulations (requiring prior approval of any public comment regarding the plans, policies, or administration of the Department) and section 25 (forbidding unauthorized comment on fires or Department business generally), as written, cannot pass constitutional muster.[11] I have a different view of section 37, which requires a firefighter summoned to testify before a court or investigating agency to notify the Department of the subpoena. Department officials have a legitimate interest in monitoring public scrutiny of departmental affairs. The regulation does not require the permission of fire authorities to testify, nor does it require that a firefighter disclose the nature of the official inquiry or the substance of any proposed testimony. Section 37 consequently does not smack of a prior restraint or a restriction on speech. It therefore does not offend the First Amendment.[12]

---

**10.** If anything, the public statements attributed to plaintiffs regarding the staffing dispute are on the mild end of the spectrum that the court has encountered in similar cases arising in a collective bargaining context.

**11.** This is not to say that defendants are prohibited from imposing any restrictions whatsoever on firefighters' public speech. As plaintiffs' counsel conceded at oral argument, regulations prohibiting a firefighter from disclosing confidential information relating to a fire investigation or litigation involving the Department, or requiring firefighters exercising their right to public speech to make clear that they are speaking in their private capacities, would be lawful and appropriate.

**12.** I do not address the November 1, 2002 directive. Defendants have conceded that the directive is unconstitutional and unenforceable and the issue is therefore moot. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). This case does not fall within the mootness exception of *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n. 10, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). The defendants have litigated in good faith throughout and there is no "reasonable expectation that the challenged conduct will be repeated following dismissal of

*The Ban on Political Signage at the Fire Station*

Plaintiffs characterize the Commissioner's April 26, 2002 directive banning all unofficial signage from the fire station and adjacent parking lot as an unlawful "prior restraint."[13] It is settled law "that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace*, 461 U.S. 171, 176, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). *See also Spence v. Washington*, 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). Extrapolating from this proposition, plaintiffs assert an unfettered right to use the fire station and its parking lot as a platform for their campaign against the Department's staffing policy and as a billboard for the Union's grievances against departmental policies.

There is a fundamental flaw to plaintiffs' argument. Simply because speech is protected does not mean that it is immune from regulation in whatever venue it occurs. Quite the contrary, government may regulate expressive conduct that is incompatible with the uses to which public property is dedicated. In appropriate circumstances, such regulation may include a total ban on expression. *See United States v. Kokinda*, 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (upholding a blanket ban on solicitation by advocacy groups on post office grounds). In *Kokinda*, a plurality of the Court reaffirmed the tripartite "forum analysis" set out in *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Under *Perry*, regulations affecting speech on government property that has been traditionally devoted to expressive activity, or on property, which although not traditionally open for assembly and debate has been designated for these purposes by government, is subject to the strictest of scrutiny. *Id.,* at 45, 103 S.Ct. 948. However,

> [p]ublic property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Greenburgh Civic Ass'n., supra,* 453 U.S. at 129, 101 S.Ct. 2676. In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. *Id.,* 453 U.S. at 131 n. 7, 101 S.Ct. 2676. As we have stated on several occasions, " " '[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " " *Id.,* at 129–130, 101 S.Ct. 2676, quoting *Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), in turn quoting *Adderley v. Florida*, 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

*Perry*, 460 U.S. at 46, 103 S.Ct. 948.

Whether property has status as a "public forum" is defined by its "objective char-

---

the case." *D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 55 (1st Cir.1999).

**13.** On April 26, 2002, Commissioner Kinnon issued a memorandum to then Fire Chief LaFrenier directing that no signs were to be displayed on Fire Department or City property that were not official in nature. It is this directive that the City now seeks permission to enforce. The ban also extends to the "red zone" in front of the station. The "red zone" is a restricted parking area intended to insure unhindered access to the station by fire apparatus. I do not understand plaintiffs to object to the ban on parking their personal vehicles at the entrance to the fire station.

acteristics." *International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 698, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (Kennedy, J., concurring).

> If the objective, physical characteristics of the property at issue and the actual public access and uses that have been permitted by the government indicate that expressive activity would be appropriate and compatible with those uses, the property is a public forum. The most important considerations in this analysis are whether the property shares physical similarities with more traditional public forums, whether the government has permitted or acquiesced in broad public access to the property, and whether expressive activity would tend to interfere in a significant way with the uses to which the government has as a factual matter dedicated the property.

*Id.* at 698–699, 112 S.Ct. 2701.

Traditional public fora include parks, public streets, most sidewalks, and public grounds. *See Cox v. State of Louisiana,* 379 U.S. 536, 549–550, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (street adjacent to courthouse); *Edwards v. South Carolina,* 372 U.S. 229, 236–238, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (state capitol grounds); *United States v. Grace,* 461 U.S. 171, 183–184, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (sidewalks adjoining the Supreme Court); *Loper v. New York City Police Department,* 999 F.2d 699, 705–706 (2d Cir.1993) (city sidewalks). Non-public fora include military installations, post office grounds, the corridors of public office buildings, public parking lots, airport terminals and other transit facilities. *See Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (streets and sidewalks of a military base); *Kokinda,* 497 U.S. at 727, 110 S.Ct. 3115 (sidewalk serving a post office); *Markowitz v. United States,* 598 A.2d 398, 404 (D.C.1991) (corridors of the U.S. Capitol); *Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1204–1205 (11th Cir.1991) (interstate rest stops); *Krishna Consciousness,* 505 U.S. at 683, 112 S.Ct. 2701 (airport terminals); *Young v. New York City Transit Authority,* 903 F.2d 146, 161–162 (2d Cir.1990) (municipal subway systems); *Grattan v. Bd. of School Commissioners of Baltimore City,* 805 F.2d 1160, 1162–1163 (4th Cir.1986) (public school parking lots).

 It cannot seriously be disputed that a fire station falls into the category of a non-public forum. It shares none of the indicia defining a traditional public forum: it offers no historical right of public access for the conduct of expressive activity—indeed such activity would interfere with the functions to which the station is dedicated and would threaten the safety of not only those using the property for expressive purposes, but also the safety of a public dependent on the undistracted response of fire personnel during an emergency. That being so, any restriction on expressive activity in and on the station's property, up to and including an absolute prohibition, "need only satisfy a requirement of reasonableness. We reiterate what we stated in *Kokinda:* The restriction 'need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation.'" *Krishna Consciousness,* 505 U.S. at 683, 112 S.Ct. 2701.

Defendants' prohibition of expressive activity in the fire station and on its parking lot passes any reasonableness test. As defendants persuasively frame the issue, "[t]he transformation of the workplace into a [floating] billboard for the Union is not a reasonable 'manner, time and place' for employee speech." Defendants' Preliminary Injunction Opposition, at 12. The display of provocative signs on station premises questioning the integrity of the policy determinations of the Department's leadership has the potential to undermine

firefighters' loyalty, discipline, and morale. *See Greer,* 424 U.S. at 840, 96 S.Ct. 1211. While it is true that defendants have not pointed to specific instances in which firefighting functions have as yet been impaired by plaintiffs' expressive conduct, the Department does not have "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick,* 461 U.S. at 152, 103 S.Ct. 1684. Because the ban on expressive activity on fire department grounds is consistent with the Department's legitimate interest in "preserv[ing] the property ... for the use to which it is lawfully dedicated," *Postal Service v. Council of Greenburgh Civic Assns.,* 453 U.S. 114, 129–130, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981), the ban is lawful.[14]

### The Disciplinary Actions

Where a government employee meets his burden of showing that his speech or expressive conduct outweighs any governmental interest in its suppression, he must still show that the protected activity was a substantial or motivating factor influencing an adverse employment action. *See Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The *Mt. Healthy* causation test is a burden-shifting test. If the plaintiff succeeds in establishing this causal relationship, the burden of persuasion shifts to the defendants to prove "by a preponderance of the evidence," *id.,* that the adverse employment action would have been taken "even in the absence of the protected conduct," *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568. *Guilloty Perez,* 339 F.3d at 55–56. The disciplinary actions taken by the Department fall into three categories. Plaintiffs Yoshizumi, Buckley, Feran, Varzakis, and Parow received written reprimands for parking their vehicles with posted signs protesting the staffing reduction in the station parking lot or on nearby streets. The reprimands were issued pursuant to the Commissioner's admittedly unconstitutional November 1, 2002 directive. Plaintiff Yoshizumi alleges that in January of 2003 he was subjected to a disciplinary transfer because of the sign-posting incident. Plaintiff Parow was reprimanded and briefly transferred in August of 2002 for making comments to a local newspaper regarding the staffing issue and a recent fire. The reasons for these latter two disciplinary actions are a matter of factual dispute that cannot be resolved on summary judgment.[15] It is, however, undis-

**14.** Plaintiffs, relying principally on *Goodman v. City of Kansas City, Missouri,* 906 F.Supp. 537 (W.D.Mo.1995), maintain that the Department cannot constitutionally extend the ban on advocacy signage to bumper stickers affixed to their personal vehicles parked in the station lot. *Cf. Silva v. Worden,* 130 F.3d 26, 32 (1st Cir.1997) (declining to reach the question of whether a flat ban on political signs and bumper stickers on vehicles parked in a municipal employees' parking lot would be unconstitutional). The issue need not be decided as defendants state in their Opposition, at 8, that the Commissioner's directive does not apply to bumper stickers on vehicles so parked, or to signs carried on personal vehicles legally parked on streets adjacent to the

fire station. This interpretation of the directive is binding on the defendants. *Levinsky's, Inc. v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 134 (1st Cir.1997) (a clear and unambiguous admission of counsel during summation is binding on client).

**15.** No claim is made in the summary judgment pleadings that plaintiffs Sullivan and Carroll suffered any adverse consequences as a result of the challenged directive and regulations. (In the Amended Complaint it is alleged that they objected to imposing discipline on other of the plaintiffs for violating departmental policies). Consequently, they will be dismissed from the case.

puted that no plaintiff suffered a loss of pay, position, or with the possible exception of plaintiff Yoshizumi, incurred any financial penalty as a result of the disciplinary actions taken by the Department. *But see Carey v. Piphus,* 435 U.S. 247, 266–267, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).[16]

### ORDER

For the forgoing reasons, it is *ADJUDGED* and *DECLARED* that: (1) section 6 of the Department's Rules and Regulations violates the First Amendment; (2) sections 7 and 25 of the Rules and Regulations violate the First Amendment as written; (3) section 37 of the Rules and Regulations does not violate the First Amendment; and (4) the April 26, 2002 directive of the Commissioner banning all signs of an advocacy nature from fire station premises is a valid exercise of governmental authority that does not offend the First Amendment. The motion of plaintiffs Yoshizumi, Buckley, Feran, Varzakis, and Parow for summary judgment on their First Amendment injury claims relating to the November 2002 written reprimands is *ALLOWED*. The motion of plaintiffs Yoshizumi and Parow for summary judgment on their First Amendment injury claims regarding the January 2003 transfer and the August 2002 reprimand and transfer is *DENIED*. These matters will be set for trial. The claims of plaintiffs Sullivan and Carroll are *DISMISSED*. Plaintiffs' motion for summary judgment and a permanent injunction barring defendants from enforcing the Commissioner's November 1, 2002 directive is *MOOT* in light of the defendants' concession that the directive is unconstitutional. Trial on all outstanding issues will be set

by the Clerk to commence at 9:00 a.m. on March 15, 2004.

SO ORDERED.

---

**16.** I strongly recommend that plaintiffs reconsider the demand for punitive damages advanced in their Amended Complaint. *See*

*Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271,.101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).